**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **IMMIGRANT DEFENSE PROJECT** |
| **and NEW SANCTUARY** |
| **COALITION,** |
| |
| **Plaintiffs,** |
| |
| v. |
| |
| **UNITED STATES** |
| **IMMIGRATION AND CUSTOMS** |
| **ENFORCEMENT,** |
| |
| **Defendant.** |
| |

Case No.

**COMPLAINT FOR**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**

Freedom of Information Act Request
5 U.S.C. § 552

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking declaratory, injunctive, and other appropriate relief to compel Defendant, Immigration and Customs Enforcement ("ICE"), to produce agency records that have been improperly withheld from Plaintiffs, Immigrant Defense Project ("IDP") and New Sanctuary Coalition ("NSC") (collectively "Plaintiffs").

2.      Plaintiffs bring this action to compel production of documents sought in two FOIA requests, dated December 19, 2019, related to a time-sensitive and urgent public policy matter: the intensive, seemingly arbitrary and often punitive surveillance and supervision requirements imposed by ICE upon immigrants, including decades-long residents, asylum-seekers, and stateless individuals, as conditions of release from physical confinement. *See* Exs. A and B.

3.      ICE's various supervision programs rely heavily on carceral monitoring technology that reproduce conditions of incarceration by depriving individuals of liberty and

privacy.[1]  Conditions of release are imposed at the discretion of ICE officers or ICE contractors and include GPS monitoring via ankle shackle or smartphone application, regular phone check-ins using voice and facial recognition technology, in-person check-ins, unannounced house visits, workplace visits, travel restrictions, and curfews, among others.

4.  Plaintiffs seek the disclosure of records concerning the creation, management, and implementation of supervision programs in order to better understand the impacts and implications of ICE's surveillance of millions of people. Plaintiffs' FOIA request includes, but is not limited to, internal policy memoranda, training manuals and materials, weekly and monthly progress reports, and aggregate data on enrollment for all ICE supervision programs, including supervision of individuals enrolled in "Alternative to Detention (ATD) programs and supervision of individuals released on Orders of Supervision and Orders of Release on Recognizance. Plaintiffs further seek documents detailing the relationship between ICE and its contractors.

5.  ICE's supervision programs have expanded dramatically in recent years and will be at the heart of upcoming bipartisan negotiations regarding the future of immigration detention and enforcement. In the last several years, calls to dismantle and defund ICE have gained momentum[2] amidst widespread condemnation of the agency's unaccountable culture of surveillance,[3] violent policing and enforcement,[4] frequent and systematic human rights abuses

---

[1] For purposes of this complaint, the term "supervision program" refers to Orders of Supervision ("OSUPs") and Alternative to Detention ("ATD") programs – including but not limited to the Intensive Supervision Appearance Program ("ISAP"), technology-only monitoring programs, Population Management programs – and other forms of supervision for noncitizens which are administered by DHS and third-party contractors, including non-government actors.

[2] Silky Shah, *Why America still needs to abolish ICE*, THINK Opinion, NBC NEWS (Oct. 4, 2020), https://www.nbcnews.com/think/opinion/why-america-still-needs-abolish-ice-ncna1243293.

[3] McKenzie Funk, *How ICE Picks Its Targets in the Surveillance Age*, The New York Times Magazine (Oct. 2, 2019), https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html ("Telmate's [one contractor for ICE detention communications] privacy policy tells inmates and their friends and family members to 'assume that all communications will be accessed, reviewed, analyzed, searched, scrutinized, rendered searchable, compiled, assembled, accumulated, stored, used and transferred.'"); *ICE Records Confirm that Immigration Enforcement Agencies are Using Invasive Cell Phone Surveillance Devices*, American Civil Liberties Union (May

-2-

within detention centers,[5] and the separation of families.[6] Now, in the wake of the most recent

elections, a divided Congress will engage in one of the most contentious ICE appropriations

processes in recent history and a new presidential administration will transition to power that has

publicly promised to curb the rise in immigrant detention.[7]

6.     Although policymakers are poised to make crucial decisions about the future of

ICE detention and supervision, ICE has worked to keep its supervision policies and practices

shrouded in secrecy. Nevertheless, numerous questions and concerns have emerged as a growing

number of people report wide ranging and severe harms of ICE supervision. Immigrants subject

to supervision have reported that the GPS-enabled ankle shackles cause electric shocks,

headaches, difficulty breathing, bruising and bleeding around the ankles, and other injuries that

have resulted in hospitalization.[8] Frequent in-person check-ins and house and workplace visits

---

27, 2020), https://www.aclu.org/news/immigrants-rights/ice-records-confirm-that-immigration-enforcement-agencies-are-using-invasive-cell-phone-surveillance-devices/.

[4] *ICE Abused Somalis for 2 Days On a Plane and Now Wants to Send Them Into Harm's Way*, American Civil Liberties Union (Jan. 10, 2018, 1:00 PM), https://www.aclu.org/blog/immigrants-rights/ice-and-border-patrol-abuses/ice-abused-somalis-2-days-plane-and-now-wants ("The Somalis reported being shackled and beaten by ICE agents and forced to stay seated. . . Rahim, who has diabetes, stated he was denied access to the restroom on the flight and was forced to urinate in bottles and, when he ran out of bottles, on himself. Being shackled the entire time left his legs severely swollen and he sustained an injury to his hand when an ICE agent twisted it. Rahim recounted the humiliation and physical abuse on the plane, including instances of ICE agents choking a man and throwing another on the floor, resulting in visible, bloody injury, as 'inhumane, like we were slaves or something.'").

[5] *See generally* Eunice Hyunhyu Cho et al., *Justice-Free Zones: U.S. Immigration Detention Under the Trump Administration*, ACLU Research Report, 5 (2020), https://www.hrw.org/sites/default/files/supporting_resources/justice_free_zones _immigrant_detention.pdf (detailing uses of force, poor conditions, and medical care shortages in immigration detention); Gregory Hooks & Bob Libal, *Hotbeds of Infection: How ICE Detention Contributed to the Spread of COVID-19 in the United States*, Detention Watch Network (Dec. 2020), https://www.detentionwatchnetwork.org/sites/default/files/reports/DWN_Hotbeds%20of%20Infection_2020_FOR%20WEB.pdf (analyzing the effect of immigrant detention on COVID-19 outbreaks both inside and outside of detention centers).

[6] *See generally Family separation under the Trump administration - a timeline*, Souther Poverty Law Center (June 17, 2020), https://www.splcenter.org/news/2020/06/17/family-separation-under-trump-administration-timeline.

[7] *The Biden Plan for Securing Our Values As a Nation of Immigrants*, https://joebiden.com/immigration/ (advocating for the end of for-profit detention centers and prolonged immigrant detention).

[8] Ruthie Epstein, *ICE is using an alternative to immigrant detention. But it's inhumane*, Opinion Section, The Washington Post (Sept. 5, 2018), https://www.washingtonpost.com/news/theworldpost/wp/2018/09/05/trump-immigrants-2/.

disrupt people's lives,[9] interrupt work and childcare responsibilities,[10] and are used by ICE to harass and threaten immigrants.[11] Further, the data collected from ICE supervision, primarily from GPS-enabled ankle shackles and smartphone applications, is reported to enable surveillance of whole communities.[12]

7.     Given the implications of ICE supervision programs and upcoming decisions by law and policymakers, Plaintiffs' FOIA requests are urgent. *See* Exs. A and B. The records requested in Plaintiffs' FOIA are essential to ensuring that the public is fully informed about current ICE supervision practices and able to effectively engage law and policymakers, who are presently discussing the future of immigrant detention and surveillance and the carceral state. ICE's failure to respond to Plaintiffs' FOIA requests, which were submitted nearly one year ago, prevents the public from having a meaningful voice in addressing this issue at a critical stage in the debate. *See* Exs. E and F (included without attachments).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction), 5 U.S.C. § 552(a)(4)(B), and 5 U.S.C. § 1346 (United States as defendant).

9.     Plaintiffs have their principal places of business within this District and Defendant ICE maintains a field office in this District and operates in all 50 states. Jurisdiction and venue are therefore proper under 5 U.S.C. § 552(a)(4)(B).

---

[9] Rutgers Sch. of Law-Newark Immigrant Rights Clinic, *Freed But Not Free: A Report Examining the Current Use of Alternatives to Immigration Detention*, 17–18 (2012).
[10] *Id*. at 16.
[11] *Id*. at 3, 11.
[12] Funk, *supra* note 3; Nausicaa Renner, *As Immigrants Become More Aware Of Their Rights, Ice Steps Up Ruses and Surveillance*, The Intercept (July 25, 2019, 12:09 PM), https://theintercept.com/2019/07/25/ice-surveillance-ruse-arrests-raids/ ("ICE has intensified its use of tactics designed to create confusion and fear in communities").

10.     Venue is also proper under 28 U.S.C. §§ 1391(e) and 1402(a) as a civil action against an agency of the United States.

## PARTIES

11.     Plaintiff Immigrant Defense Project ("IDP") is an expert resource and advocacy organization that monitors the intersection of the criminal legal and immigration systems.[13] IDP disseminates information about these issues and provides training, advice, and support to policy makers, attorneys, the general public, and affected communities, and these materials routinely include information obtained through FOIA requests.[14] IDP is a nonprofit organization fiscally sponsored by the Fund for the City of New York, a 501(c)(3) headquartered in New York. IDP's principal place of business is located in New York, N.Y.

12.     Plaintiff New Sanctuary Coalition ("NSC") is a coalition of individuals and faith communities that directly supports immigrants facing deportation through community support, activism, and pro se legal clinics. It is an immigrant-led organization that empowers those navigating the immigration system by equipping them with "the knowledge they need to navigate the immigration system and lead the movement."[15] NSC shares Know Your Rights resources, social media toolkits, explainers about new bills and regulations under consideration,

---

[13] *Mission*, Immigrant Defense Project, https://www.immigrantdefenseproject.org/about/.

[14] *IDP Resources*, Immigrant Defense Project, https://www.immigrantdefenseproject.org/resources2/; *Denied, Disappeared, and Deported: The Toll of ICE Operations at New York's Courts in 2019*, Immigrant Defense Project (Jan. 2020), https://www.immigrantdefenseproject.org/wp-content/uploads/Denied-Disappeared-Deported-FINAL.pdf (data in part provided by information obtained in *Immigrant Defense Project v. U.S. Immigration and Customs Enforcement*); *Defend Against ICE Raids and Community Arrests*, Immigrant Defense Project (2017), https://www.immdefense.org/raids-toolkit/ (including documents obtained in the *Immigrant Defense Project et al. v. ICE*, et al. FOIA litigation); *Insecure Communities, Devastated Families: New Data on Immigrant Detention and Deportation Practices in New York City*, Immigrant Defense Project (July 23, 2012), https://www.immigrantdefenseproject.org/wp-content/uploads/2012/08/NYC-FOIA-Report-2012-FINAL-Aug.pdf (data in part provided through FOIA with ICE); *ICE Raids FOIA*, Immigrant Defense Project, https://www.immigrantdefenseproject.org/raids-foia/ (information on ICE trainings and practices around home raids, obtained through ongoing FOIA litigation, available online).

[15] *Who Is NSC*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/who_is_nsc/.

and testimonials from detained NSC members.[16] NSC also provides free legal support and referrals through programs and clinics staffed by volunteer lawyers and trained lay people who spread knowledge of immigrants' rights, assist with immigration applications, advise on pro se defense at court appearances, and advocate to increase immigrants' access in detention centers to legal defense tools.[17] NSC's sole office and principal place of business is located in New York, N.Y.

13.     Defendant Immigration and Customs Enforcement ("ICE") is a component agency of the Department of Homeland Security ("DHS"). It is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). ICE has field offices in New York, N.Y. and operates in all 50 states. Upon information and belief, ICE has possession, custody, and control over the records Plaintiffs seek.

## STATEMENT OF FACTS

All statements herein are made upon information and belief except where the basis of knowledge is specified.

### I.     ICE HAS EXPANDED SUPERVISION PROGRAMS TO BUILD A WIDE-REACHING, HARMFUL AND SECRETIVE SURVEILLANCE APPARATUS.

14.     Under the Trump administration, ICE has gained unprecedented power. According to Thomas Homan, former Acting ICE Director, Trump's election took "the handcuffs off" of ICE, and the administration designed its immigration policies to inspire maximal fear in immigrants in order to encourage "self-deportation."[18] In the first eight months

---

[16] *Resources*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/resources/; *Friends in Sanctuary*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/sanctuary/; *Save Asylum*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/save_asylum/; *Pass the SCAR Act*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/scaract/; *Let My People Go*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/let_my_people_go/.
[17] *Get Involved*, New Sanctuary Coalition, https://www.newsanctuarynyc.org/get-involved/.
[18] Franklin Foer, *How Trump Radicalized ICE*, The Atlantic (Sept. 2018), https://www.theatlantic.com/magazine/archive/2018/09/trump-ice/565772/.

of the Trump administration, immigration arrests increased by 42 percent, and ICE agents began

targeting immigrants when they dropped their children at school or sought medical treatment at

hospitals.[19]

15.    The Trump administration embraced a presumption of detention for all

immigrants in removal proceedings.[20] Under Trump, the immigrant detention infrastructure

expanded by fifty percent.[21] Whereas just 25 years ago, in 1995, the nationwide average daily

population in immigrant detention was 7,500, as of 2019, ICE at times held 56,000 people in

detention per day.[22]

16.    At the same time, the Administration began heavily expanding its immigrant

supervision and surveillance apparatus, including the Intensive Supervision Appearance Program

(or "ISAP"), which uses carceral, electronic monitoring technology to surveille immigrants. Over

the last several years, enrollment in ISAP has nearly quadrupled, increasing from 26,625 people

in 2015 to 101,568 people in 2019.[23] On March 23, 2020, ICE awarded a "firm-fixed price

---

[19] *Id.*

[20] Although detention has always been present in the history of U.S. immigration enforcement, there was historically a presumption of release or parole pending the outcome of immigration proceedings. According to an Address by Attorney General Brownell, in 1954, fewer than 100 people were in immigration custody. *See* Herbert Brownell, Jr., *Humanizing the Administration of Immigration Law* (Jan. 26, 1955), https://www.justice.gov/sites/default/files /ag/legacy/2011/09/12/01-26-1955.pdf. This changed when the Reagan administration detained thousands of Haitian refugees for extended periods of time, setting the U.S. on a path of ever-increasing detention. *See Detention Policies Affecting Haitian Nationals*, General Accounting Office, Washington, D.C., General Accounting Office, ii (June 16, 1983), https://www.gao.gov/assets/150/140191.pdf. The 1980s also saw the rise of the private prison industry, which quickly expanded into immigrant detention and electronic monitoring. Two of the largest private prison and detention companies, Corrections Corporation of America (formerly CCA, now CoreCivic), and GEO Group (formerly the Wackenhut Corporation) were founded in the early 1980s. *See* Melina Juárez, Bárbara Gómez-Aguiñaga and Sonia P. Bettez, *Twenty Years After IIRIRA: The Rise of Immigrant Detention and Its Effects on Latinx Communities Across the Nation*, 6 JMHS 1, 78 (2018), https://www.immigrationresearch.org/system/files/Twenty_Years_After_ IIRIRA.pdf.

[21] Eunice Hyunhyu Cho et al., *Justice-Free Zones: U.S. Immigration Detention Under the Trump Administration*, ACLU Research Report, 5 (2020), https://www.hrw.org/sites/default/files/supporting_resources/justice_free_zones _immigrant_detention.pdf.

[22] *Id.* at 4.

[23] Audrey Singer, *Immigration: Alternatives to Detention (ATD) Programs*, Cong. Research Serv., R45804, 7–8 (2019), https://fas.org/sgp/crs/homesec/R45804.pdf.

indefinite delivery-indefinite quantity contract" for ISAP to Behavioral Interventions ("BI") Inc. The contract is likely worth $2.2 billion dollars.[24]

17.     Amidst this dramatic expansion of supervision, there is a notable absence of current information regarding ICE supervision policies and practices. While recent reports of dangerous conditions inside detention centers have prompted official investigations, there has been no comparable review of the experiences of immigrants under ICE supervision. The disclosure of records requested by Plaintiffs seeks to remedy the glaring absence of up-to-date information on supervision programs, which have changed dramatically under the Trump administration. *See* Exs. A and B.

**A. Although Referred to as "Alternatives to Detention," ICE Supervision Programs are in Fact Alternative *Forms of* Detention, Extending ICE's Custodial Powers into Households and Communities, and Permitting ICE Officers to Exercise Unfettered Discretion Without Oversight.**

18.     In 1996, ICE's predecessor agency, Immigration and Naturalization Services ("INS"), began experimenting with supervision as a condition of release through a contract with the Vera Institute.[25] This three-year pilot program, the Appearance Assistance Program tested an "alternative to detention" strategy that included in-person and telephonic reporting requirements, as well as home visits.[26]

19.     Later in 1996, the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA") went into effect, increasing the scope and harshness of existing immigration

---

[24] Jane Edwards, *BI Awarded $2.2B ICE Intensive Supervision Appearance Program IV Support IDIQ*, GOVCON Wire (Mar. 24, 2020), https://www.govconwire.com/2020/03/bi-awarded-22b-ice-intensive-supervision-appearance-program-iv-support-idiq/.
[25] *Testing Community Supervision for the INS: A Evaluation of the Appearance Assistance Program: Final Report to the Immigration and Naturalization Service*, Vera Inst. of Justice, ii (2000), https://www.vera.org/publications/testing-community-supervision-for-the-ins-anevaluation-of-the-appearance-assistance-program.
[26] *Id.*

laws, and creating broad provisions mandating detention for many immigrants.[27] As a result, the number of people in detention began to steadily rise. By 2003, when ICE was established, the average daily population in immigrant detention had risen to 21,133.[28]

20. That year, ICE began developing new pilot programs, including the Intensive Supervision Appearance Program ("ISAP") and the Electronic Monitoring Device Program ("EMD").[29] The carceral monitoring tools employed by ISAP and EMD include: curfews, ankle shackles, telephonic check-ins with voice recognition, frequent in-person reporting requirements, and unscheduled home and workplace visits.[30]

21. Management of ISAP was contracted out to BI, Inc., a company founded in 1978 as a cattle monitoring service, which adapted its technology for human monitoring. BI, Inc. was purchased by GEO Group in 2011 and today has earned more than half a billion dollars from ICE supervision contracts.[31] GEO Group is the largest private carceral monitoring company in the world and operates private prisons and ICE detention facilities, and it has both donated to and profited from Donald Trump's presidency.[32]

---

[27] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

[28] Dara Lind, *Congress's deal on immigration detention, explained*, Vox.com (Feb. 12, 2019), https://www.vox.com/2019/2/12/18220323/immigration-detention-beds-congress-cap.

[29] *History of ICE*, ICE, https://www.ice.gov/features/history/. INA § 236(a), 8 U.S.C. § 1226(a) provides for the release of noncitizens who are not subject to mandatory detention and are awaiting removal proceedings and gives ICE the authority to impose conditions of release on immigrants in removal proceedings. *See* 8 C.F.R. § 236.1. Similarly, if, after being ordered removed, a detained noncitizen cannot be removed within a reasonable time, the noncitizen must be released from detention and ERO officers have the discretion to release the person on an order of supervision (OSUP) under INA § 241. Detention and Removal of Aliens Ordered Removed, 8 U.S.C. § 1231; *see also* 8 C.F.R. § 241.5 (providing regulatory authority).

[30] Wesley J. Lee, *Memorandum for Field Office Directors: Eligibility Criteria for Enrollment into the Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD) Program*, U.S. Immigration and Customs Enforcement, 1–3 (May 11, 2005), https://www.ice.gov/doclib/foia/dro_policy_memos/dropolicy memoeligibilityfordroisapandemdprograms.pdf.

[31] Lucas High, *Boulder's BI Incorporated has earned more than half-billion dollars from ICE contracts*, Daily Camera (July 13, 2018, 11:33 PM), https://www.dailycamera.com/2018/07/13/boulders-bi-incorporated-has-earned-more-than-half-billion-dollars-from-ice-contracts/.

[32] *The GEO Group Inc.,* Investigate: A Project of the American Friends Service Committee (last updated July 24, 2019), https://investigate.afsc.org/company/geo-group (noting GEO Group's donation of $250,000 to President Trump's inaugural fund and reporting on 2017 shareholder meeting during which GEO Group's Senior Vice

22.     During the first Obama administration, ICE increased the number of individuals participating in ATD programs, and the length of time individuals spent in ATD programs.[33] However, rather than reduce the number of people detained, detentions continued to increase.[34] In response to public pressure, in 2013, the Obama administration announced a new automated Risk Classification Assessment (RCA) tool to "improve transparency and uniformity in detention custody and classification decisions."[35] The administration also instructed ICE officers to exercise discretion and release individuals the agency considered "low-priority" or "vulnerable".[36]

23.     Although the Obama administration embraced supervision, it continued to limit enrollment in ISAP in favor of less stringent conditions of release. In January 2016, the Obama

---

President, a former ICE official, praised the profitability of the administration's zero-tolerance immigration policies).

[33] *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness*, U.S. Gov't Accountability Office, GAO-15-26, 13 (2014), https://www.gao.gov/assets/670/666911.pdf. In FY 2013, 23,954 people were enrolled in ATD programs. *Id.* at 8.

[34] In FY 2013, ICE detained close to 80% of those it arrested, nearly 441,000 people. Mark Noferi & Robert Koulish, *The Immigration Detention Risk Assessment*, Geo. Immigr. L. Rev., Vol. 29, No. 45 (2014), SSRN: https://ssrn.com/abstract=2635652 (citing *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness*, U.S. Gov't Accountability Office, GAO-15-26, 6-7 (2014), http://www.gao.gov/products/GAO-15-26).

[35] John Morton, *Written testimony of U.S. Immigration and Customs Enforcement Director John Morton for a House Committee on the Judiciary hearing titled: "The release of criminal detainees by U.S. Immigration and Customs Enforcement: Policy or Politics?"* (Mar. 19, 2013), https://www.dhs.gov/news/2013/03/19/written-testimony-us-immigration-and-customs-enforcement-director-john-morton-house ("In early February, ICE was maintaining an average daily population in excess of 35,000 individuals, including many who did not require detention by law. These detention levels exceed Congressional appropriations."). The RCA algorithm, which has never been made public, recommended either detention or release and had the ability to recommend custody or supervision classifications. *See Privacy Impact Assessment Update for the Enforcement Integrated Database (EID) Risk Classification Assessment (RCA 1.0), Enforce Alien Removal Module (EARM 5.0), and Crime Entry Screen (CES 2.0)*, U.S. Dep't of Homeland Sec., 4 (2012), http://www.dhs.gov/xlibrary/assets/privacy/privacy_piaupdate_EID_april2012.pdf.

[36] Jeh Charles Johnson, *Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants*, U.S. Dep't of Homeland Sec., 2-5 (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf (instructing officers not to detain those who suffered from "serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest").

administration launched a new pilot program, the Family Case Management Program (FCMP), for "families with vulnerabilities not compatible with detention."[37]

24.     In June 2017, the Trump administration terminated the Family Case Management Program and instead, prioritized detentions and more invasive supervision.[38] The Trump administration changed the RCA tool used by ICE to make custody determinations to no longer recommend release under any circumstance.[39] The average daily population in detention rose to 54,082 in 2019, from an average of 42,000 in 2018.[40] Meanwhile, ISAP, which originally was limited to "high-priority categories" of immigrants, is now commonly used to supervise immigrants who in the past, would have been paroled or released on bond.[41] Between 2018 and 2019, the number of people enrolled in ISAP rose from 87,384 to 101,568 people.[42]

25.     Given the radical changes in enrollment numbers and types of supervision under the Trump administration, Plaintiffs' FOIA request seeks records that will enable the public to better understand the current policies, practices, and protocols behind initial custody determinations and risk assessments, decisions to escalate or de-escalate terms of supervision, and the parameters of ICE, BI Inc., and other contractors' discretion to make these decisions. *See* Exs. A and B.

---

[37] The program only operated from January 2016 through June 2017, and 952 adults and 1,211 children were enrolled in it in 5 metropolitan areas. Singer, *supra* note 23, at 11.

[38] Alan Pyke, *1 year ago, Trump got rid of a wildly successful immigration program that didn't lock people up*, Think Progress (June 21, 2018), https://archive.thinkprogress.org/trump-ended-successful-migrant-monitoring-program-because-didnt-deport-enough-bd506068c05c/.

[39] *See* Adi Robertson, *ICE rigged its algorithms to keep immigrants in jail, claims lawsuit: A 'secret no-release policy'*, The Verge (Mar. 3, 2020), https://www.theverge.com/2020/3/3/21163013/ice-new-york-risk-assessment-algorithm-rigged-lawsuit-nyclu-jose-velesaca; Mica Rosenberg & Reade Levinson, *Trump's catch-and detain policy snares many who have long called U.S. home,* Reuters (June 20, 2018), https://www.reuters.com/investigates/-special-report/usa-immigration-court/.

[40] Singer, *supra* note 23, at 6; Geneva Sands, *This year saw the most people in immigration detention since 2001*, CNN Politics (Nov. 12, 2018, 10:02 PM), https://www.cnn.com/2018/11/12/politics/ice-detention/index.html.

[41] Julie Pittman, *Released into Shackles: The Rise of Immigrant E-Carceration*, 108 Calif. L. Rev. 587, 593 (2020); Joanna Bernstein, C*aseworkers Say ICE Accused Women of Tampering With Ankle Monitors, Leading To Their Deportations*, Latino USA (Feb. 3 2020), https://www.latinousa.org/2020/02/13/anklemonitorsice/; *Ramirez v. United States Immigration & Customs Enf't*, No. 18-508 (RC), 2020 U.S. Dist. LEXIS 115875, at *5 (D.D.C. July 2, 2020).

[42] Singer, *supra* note 23, at 7–8.

### B. ICE Abuses Its Supervisory Powers to Harass, Threaten and Intimidate Immigrants at Their Check-ins.

26. At a minimum, immigrants who are subject to supervision during or after their removal proceedings must report to ICE or ISAP officers for regular in-person check-ins. Home and workplace visits are frequent as well. More than 2.9 million immigrants are required to report for regular check-ins and face possible re-detention at each one.[43] Check-ins and visits are scheduled at the discretion of the ICE or ISAP officers and occur as frequently as every week.[44] Plaintiffs' FOIA request seeks to uncover more information about these check-ins given concerning anecdotal reports of re-detention at check-ins, the monitoring of waiting rooms, and frequent weekend check-ins. *See* Exs. A and B.

27. Family and community members, trusted clergy, and immigration attorneys are often not permitted to accompany immigrants to check-ins with ICE officers, and immigrants report being harassed and threatened by ICE officers behind closed doors.[45] Plaintiff IDP received one report concerning a woman who missed her February 2020 check-in because she was giving birth. When she explained her absence, the ICE officer not only requested to see her child's birth certificate, but also demanded that the baby's father attend the next ICE check-in. When he did not, ICE increased the frequency of her required check-ins. In 2019, a stateless refugee reported to IDP that he was being required to report to ICE four times in a two-week period, and then threatened with non-cooperation charges if he refused to sign paperwork in a

---

[43] Gabe Ortiz, *Immigrants required to check in regularly with ICE fear not being able to walk back out, Daily Kos* (May 7, 2019), https://www.dailykos.com/stories/2019/5/7/1855799/-Immigrants-required-to-check-in-regularly-with-ICE-fear-not-being-able-to-walk-back-out.

[44] BI Inc. confirmed these general guidelines in its 2010 ISAP II Participant Handbook and stated that a person in removal proceedings was required to attend biweekly in-person reporting meetings and be subject to unannounced home visits; whereas, someone who was post-order had to report in person twice every two weeks and was subject to unannounced home visits. *See* Rutgers Sch. of Law-Newark Immigrant Rights Clinic, *Freed But Not Free: A Report Examining the Current Use of Alternatives to Immigration Detention* Appendix F (2012).

[45] Foer, *supra* note 18 (documenting the experience of an immigrant under supervision in Columbus, Ohio at an ICE check-in. ICE officers prevented his attorney from accompanying him into the check-in asserting that it was a measure put in place to protect his right to confidentiality.).

language that he did not understand. In another case, an individual reported that ICE officers made multiple unannounced home visits at 6:00am.[46] Others report being scheduled to check in with ICE on days when they are required to appear in immigration court: failure to appear for either is a violation, prompting concerns that supervision requirements are being used to justify re-detention.[47]

28. The constant threat of re-detention takes an emotional toll on immigrants and contributes to the carceral nature of intensive supervision.[48] The agency has no public guidance on who ICE might detain at a check-in and who might be sent away without incident.[49] For immigrants going to an ICE office, "each check-in can feel perilous."[50] One woman who fled Somalia as a child after her father was killed in front of her, and whose mother and sister are both U.S. citizens, said: "every time I come here, I feel like it's my last day . . . [i]f they send me back to Somalia, that's a death sentence."[51]

29. Plaintiffs seeks to address the lack of transparency regarding ICE's check-in policies by seeking disclosure of internal directives, guidelines, and performance assessments governing the decisions by individual ICE officers, including policies related to the scheduling of check-ins, requests for travel documents, accompaniment permission for family, friends, and advocates, and methods of communication. *See* Exs. A and B.

---

[46] Kyle Barron & Cinthya Santos Briones, *No Alternative: Ankle Monitors Expand the Reach of Immigration Detention*, NACLA.org (Jan. 6, 2015), https://nacla.org/news/2015/01/06/no-alternative-ankle-monitors-expand-reach-immigration-detention.

[47] Pittman, *supra* note 41, at 607.

[48] Michael E. Miller, *They fear being deported. But 2.9 million immigrants must check in with ICE anyway.*, The Washington Post (Apr. 25, 2019, 10:01 AM), https://www.washingtonpost.com/local/they-fear-being-deported-but-29-million-immigrants-must-check-in-with-ice-anyway/2019/04/25/ac74efce-6309-11e9-9ff2-abc984dc9eec_story.html.

[49] *Id.*

[50] *Id.*

[51] *Id.*

**C. The Increasing Use of Electronic Monitoring Reproduces the Conditions of Detention.**

30.     Plaintiffs' FOIA requests also seeks documents concerning the use of ankle shackles and other electronic monitoring technology, which are now routinely used to track the everyday movement of immigrants and enforce curfews and travel restrictions. Use of such technology has become even more prevalent as more people are released from immigration jails during the COVID-19 pandemic.[52] But shackles come with their own attendant harm: shackles are reported to cause swelling, numbness, severe cramps, chafing, blistering, and have even burst into flames.[53]

31.     In March 2019, two undocumented women from Guatemala had tried to loosen their ankle shackles by putting their fingers between their skin and the contraption, and one of them had to be taken to the emergency room because of pain and circulation problems caused by the ankle shackle.[54] A doctor gave her a note requesting that ICE loosen the device. However, both women were arrested by ICE after an officer alleged that they had tampered with their ankle monitors. The women were deported without hearings.[55]

32.     The stigma of wearing a shackle around one's ankle in and of itself has serious consequences.[56] One woman explained, "When you go out into the street, the whole world stops to look at your feet. A few days ago the police stopped me and asked if I had been a prisoner. I told them that I had not and they answered, then why do you wear this ankle monitor."[57] Another

---

[52] Matt Katz, *ICE Releases Hundreds of Immigrants As Coronavirus Spreads in Detention Centers*, NPR.org (Apr. 16, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/16/835886346/ice-releases-hundreds-as-coronavirus-spreads-in-detention-centers.
[53] Barron & Santos Briones, *supra* note 46; Pittman, *supra* note 41, at 602.
[54] Joanna Bernstein, C*aseworkers Say ICE Accused Women of Tampering With Ankle Montors, Leading To Their Deportations*, Latino USA (Feb. 3 2020), https://www.latinousa.org/2020/02/13/anklemonitorsice/.
[55] *Id.*
[56] Barron & Santos Briones, *supra* note 46.
[57] *Id.*

woman commented, "I feel like an animal, because only animals are treated like this. My son asked me why they put this on me, he said that they only do this to thieves."[58]

33.     The ankle shackles also limit mobility and people's ability to work[59] or care for their children. They have to be charged about every six hours and can take hours to fully charge.[60] People have been detained simply because their shackles ran out of battery.[61] If the battery dies, or if it bangs against something, an alarm is triggered.[62] One asylum seeker lost his job after his ankle shackle's alarm went off because his boss "worried it could put other undocumented employees at risk of deportation."[63]

34.     Although some courts have determined that ICE's electronic monitoring is a form of custody, ICE claims to have complete discretion to escalate or de-escalate conditions of release and does not provide regular custody redetermination hearings.[64] ICE's ISAP contractor,

---

[58] *Id.*

[59] Asylum applicants can obtain employment authorization 365 days after their asylum application is filed. *See* 8 CFR § 274a.12 (2020)*; Employment Authorization*, U.S. Citizenship and Immigration Services (Nov. 9, 2020), https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-employees/employer-information/employment-authorization; *USCIS Rule Strengthens Employment Eligibility Requirements for Asylum Seekers*, U.S. Citizenship and Immigration Services (June 6, 2020), https://www.uscis.gov/news/news-releases/uscis-rule-strengthens-employment-eligibility-requirements-for-asylum-seekers. Prior to new regulations that went into effect on August 25, 2020, asylum seekers could obtain employment authorization 180 days after they applied for asylum. *See* Max Siegelbaum and Mazin Sidahmed, *Asylum Work Permits Rules About to Undergo a Drastic Change*, Documented (Aug. 21, 2020), https://documentedny.com/2020/08/21/asylum-work-permits-rules-about-to-undergo-a-drastic-change/. Those with final orders of removal and orders of supervision can also apply for employment authorization, although this is currently at risk of being dismantled through an administrative rulemaking process. *DHS Proposes to Limit Work Permits for Aliens with Final Orders of Removal*, U.S. Citizenship and Immigration Services (Nov. 17, 2020), https://www.uscis.gov/news/news-releases/dhs-proposes-to-limit-work-permits-for-aliens-with-final-orders-of-removal#:~:text=WASHINGTON%E2%80%94The%20Department%20of%20Homeland,order%20of%20supervision%20(OSUP).

[60] *Fact Sheet: Electronic Monitoring Devices as Alternatives to Detention*, National Immigration Forum (Feb. 22, 2019), https://immigrationforum.org/article/fact-sheet-electronic-monitoring-devices-as-alternatives-to-detention/.

[61] Pittman, *supra* note 41, at 606.

[62] Joanna Bernstein, C*aseworkers Say ICE Accused Women of Tampering With Ankle Monitors, Leading To Their Deportations*, Latino USA (Feb. 3 2020), https://www.latinousa.org/2020/02/13/anklemonitorsice/.

[63] Pittman, *supra* note 41, at 608; *See also* David Yaffe-Bellany, *"It's humiliating": Released immigrants describe life with ankle monitors*, The Texas Tribune (Aug. 10, 2018), https://www.texastribune.org/2018/08/10/humiliating-released-immigrants-describe-life-ankle-monitors/.

[64] *See Nguyen v. B.I. Inc*., 435 F. Supp. 2d 1109, 1116 (D. Or. 2006); *Ali v. Napolitano*, 2020 WL 3929788 (D. Mass 2013) (because petitioner was limited "when he can travel, where he can reside, with whom he can associate, what information he may keep confidential, and the type of employment in which he can engage," he was "in custody" for

BI Inc., refuses to disclose its policies in determining levels of supervision once people are placed in ISAP.[65]

35.     Plaintiffs' FOIA requests seek records regarding policies to reduce or de-escalate levels of supervision. At the moment, there appears to be no clear policies for how such decisions are made.[66] As of 2019, the average length of time on electronic monitoring was 352 days and some have reported having to live with the ankle shackles for up to 3 years.[67] Immigrants who were released on ankle shackles at the start of the COVID pandemic for health reasons are now being re-detained without any explanation.[68]

36.     In the absence of clear policies and oversight, ICE and BI Inc. are free to impose harsh punishments at will. For example, in March 2017, Marco Tulio Hernandez, an asylum seeker from Honduras who had been in and out of the ISAP program for four years, received verbal permission from his ISAP officer to travel to Mississippi to visit his cousin. When he returned, ICE arrested him for violating his conditions of release. Hernandez's attorney

---

purpose of habeas petition); *López López v. Charles*, 2020 WL 419598 (D. Mass. 2020) (court assumes without deciding that noncitizen's electronic monitoring and check-ins constitute custody for purposes of habeas); *see also Doe v. Barr*, --- F. Supp. 3d ---, 2020 WL 4748297 (S.D.N.Y. 2020) (denying habeas relief because the conditions of supervision imposed by ICE were within its statutory authority, despite ICE's threat to the detained noncitizen, outside of the presence of counsel and immediately after the noncitizen was ordered released on bond by the immigration judge, that he would not be released if he failed to agree to the conditions of supervision).

[65] A spokesperson for GEO Group, which acquired BI Inc. in 2011, was quoted in 2018 saying that under its contract, it must refer all questions about its work to ICE. *ICE issuing more ankle monitors for immigrants*, Denver Post (Aug. 25 2018), https://www.denverpost.com/2018/08/25/ice-issuing-immigrant-ankle-monitors/.

[66] The Immigration Legal Center, which provides answers to immigrants' frequently asked questions, described the process for how to remove an ankle bracelet as follows: "There is no standard or formal process you or an advocate may initiate to have an ankle bracelet removed. The decision to remove an ankle bracelet is a decision that only ISAP makes." Immigrant Legal Center: https://www.immigrantlc.org/resource/know-your-rights-isap-check-in/.

[67] Detention Management: FY19 Detention Statistics, U.S. Immigration and Customs Enforcement (last reviewed/updated Nov. 13, 2020), https://www.ice.gov/detention-management#.

[68] Matt Katz, *Released From ICE Detention Due to COVID, NJ Green Card Holder Is Detained Again*, Gothamist (Oct. 19, 2020), https://gothamist.com/news/released-ice-detention-due-covid-nj-green-card-holder-detained-again.

commented, "A lot of the people who are on ISAP are people who would otherwise not be in detention. This is just an expanded version of detention."[69]

37.     In order to better understand possible incentives or policies underlying use of ankle shackle and electronic monitoring technology, Plaintiffs' FOIA seeks records related to ICE's contract with BI Inc. and the management of ISAP, including information specific to the New York area. *See* Exs. A and B.

### D. ICE is Inappropriately Using Supervision Programs to Surveil Immigrant and Mixed-Status Communities.

38.     Under the Trump administration, ICE has been given free rein to expand and abuse its enforcement powers. ICE has targeted immigrants' rights activists for deportation and retaliated against "Sanctuary Cities" through mass raids.[70] In order to expand its reach into communities, ICE has invested heavily in surveillance technology that has enabled them to launch the largest immigration raids in history.[71] ICE's supervision programs have become one of ICE's primary tools to monitor and surveil whole communities.[72] The full scope of this mass surveillance remains unknown. Plaintiffs' FOIA requests aim to elicit information regarding the extent of record-keeping and tracking of those who are knowingly or unknowingly subject to some form of ICE surveillance. *See* Ex. A.

39.     ICE has not disclosed how it collects and uses data from supervision programs, but recent reports confirm that data from ankle monitors is used to plan workplace and

---

[69] Jason Fernandes, *Alternatives to Detention and the For-Profit Immigration System*, Ctr. for Am. Progress (June 9, 2017), https://www.americanprogress.org/issues/immigration/news/2017/06/09/433975/alternatives-detention-profit-immigration-system [https://perma.cc/TC5M-3ZST].
[70] Nick Pinto, *Across the U.S., Trump Used Ice to Crack Down On Immigration Activists*, The Intercept (Nov. 1, 2020), https://theintercept.com/2020/11/01/ice-immigration-activists-map/.
[71] Edward Ongweso, Why Protesters Want Palantir to #disarmICE, VICE.com (July 11, 2019), https://www.vice.com/en/article/bj9ez3/why-protesters-want-palantir-to-disarmice.
[72] Ruthie Epstein, *ICE is using an alternative to immigrant detention. But it's inhumane*, Opinion Section, The Washington Post (Sept. 5, 2018), https://www.washingtonpost.com/news/theworldpost/wp/2018/09/05/trump-immigrants-2/.

community raids. In 2019, for example, ICE engaged in workplace raids that resulted in the detention of hundreds of immigrants. Unsealed search warrants from a raid in Mississippi showed that ICE used data from an ankle shackle worn by a Guatemalan woman to identify the site of the raid. In fact, immigrants on electronic monitoring were present at all five worksites that were raided in Mississippi.[73]

40.     Evolving technology also raises additional questions about encroachment on privacy rights. Ankle monitors that have two-way communication capabilities are in use today in the criminal legal system, resulting in concerns that the government would be able to eavesdrop on people's conversations.[74] The phone application that ICE uses for some check-ins raises similar concerns that the technology permits broad surveillance of individuals and their family and friends.[75]

41.     Much of what has been learned about ICE's supervision in the past has come from FOIA efforts or OIG reports. A 2009 FOIA request exposed that ICE and BI were falsifying compliance rates to bolster support for the program.[76] There has not been an OIG report regarding ICE supervision practices since 2015.[77]

42.     Although FOIA requests remain the principal avenue for obtaining information about ICE's supervision practices, under the Trump administration, ICE has been unresponsive to Plaintiffs' FOIA requests, subsequent appeals, and phone calls requesting status updates.

---

[73] *GPS tracking of immigrants in ICE raids troubles advocates*, NBC News (Aug. 15, 2019, 5:34 PM), https://www.nbcnews.com/news/us-news/gps-tracking-immigrants-ice-raids-troubles-advocates-n1042846.
[74] *See* Pittman, *supra* note 41, at 607; Kira Lerner, *Chicago is Tracking Kinds with GPS Monitors that can Call and Record them Without Consent*, The Appeal (Apr. 08, 2019).
[75] James Kilgore, *Big Tech is Using the Pandemic to Push Dangerous New Forms of Surveillance*, Truthout (June 22, 2020), https://truthout.org/articles/big-tech-is-using-the-pandemic-to-push-dangerous-new-forms-of-surveillance/.
[76] Susan Carrol, *Flaws found in options for immigrant detention*, Houston Chron. (Oct. 19, 2019), https://www.chron.com/news/houston-texas/article/Flaws-found-in-options-for-immigrant-detention-1587363.php.
[77] *Search*, Office of Inspector General, https://search.usa.gov/search/news?utf8=%E2%9C%93&affiliate= oigpublicsite_v2&channel=8244&sort_by=date&since_date=1%2F1%2F2015&until_date=12%2F14%2F2020&qu ery=alternatives+immigration+customs+enforcement.

43.     ICE's failure to disclose the policies and practices of their supervision programs undermines the central purpose of FOIA: "to ensure that the Government's activities be opened to the sharp eye of public scrutiny."[78] Plaintiffs' requests seeks to ensure that the general public is able to meaningfully engage in important conversations about immigration enforcement and immigrant rights that are currently unfolding.[79]

## II. ADDITIONAL INFORMATION IS URGENTLY REQUIRED AS CONGRESS AND THE INCOMING PRESIDENTIAL ADMINISTRATION MAKE CRITICAL DECISIONS ABOUT ICE FUNDING AND POLICY.

44.     In the coming year, policymakers will make decisions that will have lasting ramifications on the development, expansion, or contraction of ICE supervision programs. In order to make informed decisions in this area, these policymakers require the information that Plaintiffs have included in their FOIA requests.

45.     Since 2018, calls to "Abolish ICE" have gained widespread attention.[80] The issue became a principal point of tension in the midterm elections and a growing number of progressive democrats in Congress won their elections with a mandate from constituents to halt detentions and defund ICE.[81] President-Elect Joe Biden campaigned on promises of curtailing Trump's harsh immigration enforcement practices and won the state of Georgia, where voters also ousted Republican sheriffs that collaborated with ICE.[82]

---

[78] U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 774 (1989) (emphasis omitted).
[79] *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 868 (1982) (plurality opinion) ("[A]ccess to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner[.]"); *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 862-63 (1974) (Powell, J., dissenting) ("[P]ublic debate must not only be unfettered; it must also be informed.").
[80] Elaine Godfrey, *What 'Abolish ICE' Actually Means*, The Atlantic (July 11, 2018), https://www.theatlantic.com/politics/archive/2018/07/what-abolish-ice-actually-means/564752/.
[81] *Id.*
[82] Daniel Nichanian, *ICE Suffered Blows In The South In Last Week's Elections*, *The Political Report,* The Appeal (Nov. 12, 2020), https://theappeal.org/politicalreport/sheriffs-2020-immigration/.

46.     The election results all but ensure a hotly contested DHS appropriations process, which has already proven contentious, and which will likely continue through January 2021.[83]

47.     In its FY2021 proposed budget, ICE is seeking a $2 billion increase in funding, including an increase to $353.9 million for it "Alternative to Detention" programs.[84] This would enable ICE to hold 60,000 people per day in detention and increase the ISAP daily participant level to 120,000.[85]

48.     In contrast, the current DHS appropriations bill advanced by Democrats in the House of Representatives would cut over $1 billion from ICE's Enforcement and Removal Operations (ERO) budget.[86] The funding cut would reduce detentions by 50 percent, and instead invest $146.7 million more than was requested towards the expansion of ATD.[87] House Democrats have specifically highlighted their support for community based ATD programs as a solution to rising detention rates.[88] Meanwhile, on November 10, the Senate Appropriations Committees released a proposed DHS bill that increases funding to ICE to $8.8 billion.[89]

---

[83] Although the fiscal year began on October 1st, Congress passed a continuing resolution on December 11 that will keep the government funded through Dec. 18, 2020. *See Appropriations Watch: FY 2021,* Committee for a Responsible Federal Budget (Dec. 11, 2020), http://www.crfb.org/blogs/appropriations-watch-fy-2021. *See also* Caitlin Emma & Sarah Ferris, *House Democrats Yank Homeland Security Spending Bill From Floor*, Politico (July 28, 2020), https://www.politico.com/news/2020/07/28/house-democrats-homeland-security-spending-bill-from-floor-384633.

[84] Chad F. Wolf, *FY 21 Budget in Brief – Homeland Security*, U.S. Dep't of Homeland Security, 31, https://www.dhs.gov/sites/default/files/publications/fy_2021_dhs_bib_web_version.pdf.

[85] *ICE Budget Overview FY 2021: Operations and Support*, Dep't of Homeland Security, 25, https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf.

[86] Madhuri Grewal, *After Years of Advocacy, the House of Representatives Finally Cuts Funding to Trump's Deportation Force*, News and Commentary, ACLU.org (July 14, 2020), https://www.aclu.org/news/immigrants-rights/after-years-of-advocacy-the-house-of-representatives-finally-cuts-funding-to-trumps-deportation-force/.

[87] *Appropriations Committee Releases Fiscal Year 2021 Homeland Security Funding Bill*, Press Releases for House Committee on Appropriations (July 6, 2020), https://appropriations.house.gov/news/press-releases/appropriations-committee-releases-fiscal-year-2021-homeland-security-funding.

[88] At a hearing on ICE's FY 2021 budget, Congresswoman Lucille Roybal-Allard (CA-40), Chair of the Homeland Security Appropriations Subcommittee, expressed concern about the rise in detentions and expressed support for ATD programs, including the Family Case Management Program that was piloted under the Obama administration and terminated in 2017 by the Trump administration. She said, "[t]he Alternatives to Detention program, however, does have room for improvement. That is why we included funding in the fiscal year 2020 appropriation for an independent study to develop recommendations on a path forward. Nevertheless, improving ATD's effectiveness will also require a commitment from ICE, which I hope I can count on you for." Chairwoman Royal Allard Statement at Full Committee Markup of FY 2021 Homeland Security Funding Bill, *Statements,* House Committee

49. President-Elect Joe Biden has signaled that he plans to end "prolonged detention" and supports community based, non-profit "alternatives to detention" that would shift the carceral monitoring currently performed by ICE and its contractors into the non-profit field.[90] As negotiations unfold in Congress, supervision programs, whether they be community-based case management programs or ISAP, will be at the forefront of any compromise.

50. These negotiations will likely continue to play out as the Biden administration advances its legislative agenda, which includes comprehensive immigration reform. The last time a divided Congress attempted to pass comprehensive immigration reform, the Senate attempted to reduce detentions by expanding the definition of mandatory detention to "detention or custody," which would have allowed ankle shackles to be used instead of imprisonment in immigration detention.[91] A 2019 bill in the House of Representatives would also have required DHS to provide "a continuum of supervision… including community support."[92] The Biden administration is also poised to undo many executive actions taken by the Trump administration with respect to immigration enforcement.

51. This convergence of imminent policy decisions means that the public and lawmakers urgently need information about ICE's supervision practices in order to effectively participate in an informed debate about the potential expansion of carceral monitoring and supervision programs. The documents and records sought by Plaintiffs are not publicly available and would shed light on the scope, implementation, and results of supervision by ICE and its contractors.

on Appropriations, July 15, 2020, https://appropriations.house.gov/news/statements/chairwoman-roybal-allard-statement-at-hearing-on-fy-2021-ice-budget-request.

[89] S.000, 116th Cong., https://www.appropriations.senate.gov/imo/media/doc/HSFY2021.pdf.

[90] *The Biden Plan for Securing Our Values As a Nation Of Immigrants*, joebiden.com (last visited Nov. 11, 2020), https://joebiden.com/immigration/#.

[91] Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744, 133th Cong (2013-2014).

[92] H.R. Rep. No. 2415-1, at 20 (2019).

### III. PLAINTIFFS SUBMITTED FOIA REQUESTS FOR INFORMATION REGARDING ICE'S SUPERVISION PRACTICES.

52.     On December 19, 2019, Plaintiffs filed two FOIA Requests pursuant to 5 U.S.C. §§ 552 et seq. to Defendant. *See* Exs. A and B.

53.     Plaintiffs' Requests sought records related to Defendant's policies and protocols concerning the supervision and monitoring of immigrants pursuant to Orders of Supervision and other so-called "alternatives to detention." *Id.*

54.     Plaintiffs' Requests sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(II), citing the "urgency to inform the public about an actual or alleged federal government activity" and citing that requesters are "primarily engaged in disseminating information" and thus warrant expedited processing. Plaintiffs are "primarily engaged in disseminating information" and there is an urgent public need for information about ICE's supervision practices. 5 U.S.C. § 552(a)(6)(E)(v)(II); *see also* 6 C.F.R. § 5.5(d)(3). The Department of Homeland Security's regulations specifically provide that "information dissemination . . . need not be [a requestor's] sole occupation." 6 C.F.R. § 5.5(d)(3). The Plaintiffs thus meet the standard for expedited processing.

55.     Plaintiffs sought fee waivers on the basis that "disclosure of the requested materials is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest" of the Plaintiffs. 5 U.S.C. § 552(a)(4)(A)(iii). Plaintiffs are nonprofit organizations with no private commercial interest in the records requested and will make all non-confidential information available to the public, including the media, at no charge.

56.     Plaintiffs requested response within twenty business days pursuant to 5 U.S.C. § 552(a)(6)(A)(i).

**IV. ICE FAILED TO TIMELY COMPLY WITH THE FOIA REQUESTS.**

57.    On January 10, 2020, ICE sent Plaintiffs acknowledgement letters for both FOIA requests via email. Defendant assigned case numbers 2020-ICFO-16973 and 2020-ICFO-16964 to Plaintiffs' FOIA requests and granted Plaintiffs' request for fee waivers for both requests. *See* Exs. C and D.

58.    ICE's response did not address Plaintiffs' request for expedited processing in either request. *Id.*

59.    In both FOIA acknowledgment letters, ICE invoked a ten-day extension to respond to Plaintiffs' request under 5 U.S.C. § 552(a)(6)(B). *Id.*

60.    After acknowledging receipt of Plaintiffs' requests, ICE did not respond within the 30-business-day extended response period, which ended on February 25, 2020.

61.    By failing to respond to Plaintiffs' request for expedited processing within the 10 days mandated by statute, ICE constructively denied Plaintiffs' expedited processing request.

62.    On May 13, 2020, 85 business days after ICE sent the two acknowledgement letters, Plaintiffs filed administrative appeals of both FOIA Requests with the FOIA Appeals Office of the U.S. Department of Homeland Security. *See* Exs. E and F.

63.    To date, Plaintiffs have received no further response from ICE or from the Department of Homeland Security FOIA Appeals Office in regard to either FOIA Request. According to the DHS website, Plaintiffs' requested documents were estimated to be delivered August 6, 2020, a deadline that has long expired.[93]

64.    Because Defendant has failed to comply with the time limits imposed by FOIA, including with regard to administrative appeals, Plaintiffs have exhausted their administrative

---

[93] Plaintiffs' Counsel checked DHS FOIA website for case status on December 17, 2020.

remedies. 5 U.S.C. § 552(a)(6)(C)(i). Plaintiffs are therefore entitled to appeal directly to this Court for relief. 5 U.S.C. § 552(a)(4)(B).

## CAUSES OF ACTION

### COUNT I

#### FOIA VIOLATION: FAILURE TO DISCLOSE AND RELEASE RESPONSIVE RECORDS

65.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

66.     Defendant ICE failed to disclose and release records responsive to Plaintiffs' requests in violation of 5 USC § 552. By failing to disclose and release the requested records, and by failing to conduct timely and adequate searches reasonably calculated to uncover responsive records, Defendant has violated the public's right, advanced by the Plaintiffs, to agency records under 5 U.S.C. § 552(a)(6)(A), 5 U.S.C. § 552(a)(3), and Defendant's corresponding regulations.

### COUNT II

#### DEFENDANT IMPROPERLY DENIED OR HAS NOT RESPONDED TO PLAINTIFFS' REQUEST FOR EXPEDITED PROCESSING

67.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

68.     Defendant has violated Plaintiffs' right to expedited processing under 5 U.S.C. § 552(a)(6)(E) and Defendant's own regulations. 6 C.F.R. § 5.5(e).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Declare that Defendant's withholding of the requested records is unlawful;

(2) Order Defendant to immediately conduct a full, adequate, and expedited search and make available all records responsive to the Requests immediately after the Court's order;

(3) Order Defendant to engage in expedited processing in this action;

(4) Enjoin the Defendant from withholding all records responsive to the Requests;

(5) Enjoin Defendant from assessing fees or costs for the processing of the FOIA Requests;

(6) Order Defendant to prepare an index pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), for any documents they seek to withhold under a FOIA exemption;

(7) Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E); and

(8) Grant such other and further relief as this Court may deem just and proper.


Dated: New York, New York
        December 17, 2020                Respectfully Submitted,

                                         Jessica Rofé_____
                                         Jessica Rofé
                                         Olivia Abrecht, *Legal Intern**
                                         Muriel Carpenter, *Legal Intern**
                                         WASHINGTON SQ. LEGAL
                                         SERVICES
                                         NYU Immigrant Rights Clinic
                                         245 Sullivan Street, 5th Floor
                                         New York, NY 10012
                                         (212) 992-7245
                                         jessica.rofe@nyu.edu
                                         *application for law student practice forthcoming

                                         *Counsel for Plaintiffs*